United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHILDREN'S HOSPITAL AND RESEARCH
CENTER AT OAKLAND,

                Plaintiff,

        v.

HEALTH PLAN OF NEVADA, INC.; and
DOES 1 THROUGH 25, INCLUSIVE,

                Defendants.

No. 07-6069 SC

MEMORANDUM OF
DECISION, FINDINGS OF
FACT, AND CONCLUSIONS
OF LAW

I.   **INTRODUCTION**

        The Children's Hospital and Research Center at Oakland

("CHO") brought this suit in the Alameda County Superior Court in

October 2007, alleging that Defendant Health Plan of Nevada

("HPN") failed to pay the contractually required sum for medical

services provided to one of HPN's members.  Notice of Removal,

Docket No. 1, Ex. A ("Compl.").  HPN removed the action from the

Superior Court on November 30, 2007.  Notice of Removal.  HPN

filed its Answer on December 5, 2007.  Docket No. 3.  With leave

of the Court, Docket No. 34, HPN filed an Amended Answer and

Counterclaim ("Counterclaim"), asserting that it overpaid for

medical services CHO provided to two of HPN's members, Docket No.

35.  The Court denied HPN's Motion for Partial Summary Judgment

1   ("March 23, 2009, Order").  Docket No. 73.  The Court held a trial

2   on April 20, 2009.

3           After Plaintiff rested, Defendant moved for judgment on

4   partial findings.  RT at 130:3-22.[1]  The Court took the motion

5   under submission.  Id. at 131:15-16.  Having now considered all of

6   the evidence and testimony offered at trial and the arguments of

7   counsel, the Court DENIES the motion for judgment on partial

8   findings as moot.  On April 24, 2009, Defendant submitted an

9   administrative motion to file damage calculations under seal.

10  Docket No. 99.  The Court GRANTS the administrative motion.  The

11  Court by this memorandum of decision issues its findings of fact

12  and conclusions of law pursuant to Rule 52(a) of the Federal Rules

13  of Civil Procedure.  For the reasons set forth below, the Court

14  concludes HPN did not underpay CHO for medical services provided

15  to one of HPN's members.  HPN overpaid CHO for medical services

16  provided to two of HPN's members.  HPN is entitled to recover the

17  overpayments.

18

19  **II.   <u>FINDINGS OF FACT</u>**

20          A.    <u>The Parties</u>

21                1.   The Children's Hospital and Research Center at

22  Oakland ("CHO") is a California corporation.

23                2.   Health Plan of Nevada ("HPN") is a Nevada

24  corporation.

25

26  _____

27      [1] "RT" refers to the amended Transcript of Record from the
    trial held on April 20, 2009.  Docket No. 96.

28                                      2

**United States District Court**
For the Northern District of California

B.    <u>Patient A</u>

3.   Between May 1, 2006, and September 1, 2006, CHO rendered medically necessary care, including bone marrow transplants, to a cancer patient enrolled in HPN's Medicaid Managed Care Program ("Patient A").

4.   On May 16, 2006, the Parties entered into a Letter of Agreement, according to which HPN was to pay CHO as follows:

> For Medically Necessary Covered Services rendered by PROVIDER [i.e. CHO] in association with the above reference number, COMPANY [i.e. HPN] shall reimburse PROVIDER one-hundred percent (100%) of the California Medi-Cal Contracted Maximum Allowable Reimbursement rate less applicable copayments, coinsurance, and/or deductibles.

Ex. P-4 ("LoA1") § 2.

5.   The letter states that "PROVIDER agrees to reimburse COMPANY within thirty (30) days of written notification from COMPANY for any overpayment to PROVIDER made by COMPANY."   <u>Id.</u> § 7.

6.   Shaun Schoener ("Schoener"), a HPN employee, drafted LoA1.

7.   On May 18, 2006, Debbie Nielsen ("Nielsen"), a CHO employee, entered a note on her computer stating "LOA with Health Plan of Nevada to pay us for this admission at the Medi-Cal interim rate (50% of billed)."   Ex. P-16.

8.   On July 20, 2006, Nielsen faxed Schoener the most recent Hospital Interim Rate Report published by the State of California, and she included the comment that "[t]his is the basis that we utilize for payment expectations with out-of-state

3

United States District Court

For the Northern District of California

Medicaid plans and out-of-state Medicaid managed care plans."  Ex. P-5 ("July 20, 2006, Fax").

9.    CHO billed HPN $2,008,550.40 for services provided to Patient A between her admission and her death on September 1, 2006.

10.    CHO refused to provide HPN with the contract rate between Medi-Cal and CHO, claiming that the rate was confidential.

11.    In October 2006, HPN paid the Hospital $341,325.00, based on a per diem rate of $2,775.00 for the 123 days Patient A was admitted to the Hospital.

C.    Patient B

12.    Between May 17, 2006, and May 22, 2006, CHO provided care to another HPN member ("Patient B").

13.    On May 17, 2006, the Parties entered into a virtually identical Letter of Agreement for Patient B, which provides:

> For Medically Necessary Covered Services rendered by PROVIDER, COMPANY shall reimburse PROVIDER one-hundred percent (100%) of the California Medi-Cal Contracted Maximum Allowable Reimbursement rate less applicable copayments, coinsurance, and/or deductibles.

Ex. P-5 ("LoA2") § 2.

14.    The letter states that "PROVIDER agrees to reimburse COMPANY within thirty (30) days of written notification from COMPANY for any overpayment to PROVIDER made by COMPANY." Id. § 7.

15.    Schoener drafted LoA2.

16.    On May 18, 2006, Nielsen entered a note on her

4

computer stating "LOA with Health Plan of Nevada to pay us for this admission at the Medi-Cal interim rate (50% of billed)."  Ex. P-21.

17.   CHO billed HPN $101,832.53 for services provided to Patient B.

18.   CHO refused to provide HPN with the contract rate between Medi-Cal and CHO.

19.   In July 2006, HPN paid the Hospital $44,745.09 for services provided to Patient B.

D.   The Medi-Cal Contract Rate

20.   The contract for hospital inpatient services between the State of California and CHO provides that, prior to May 12, 2006, the rate of reimbursement was $1,927 per day.  P-31 ("Medi-Cal Contract") Amendment 10 § 4.1(a), Amendment 11 § 4.1(a).

21.   The contract provides that, commencing May 12, 2006, Medi-Cal would reimburse CHO at a rate of $2,000 per day. Id. Amendment 11, § 4.1(b).

22.   The contract provides that, prior to May 12, 2006, bone marrow transplant cases were reimbursed at a rate of $2,450 per day for the first 35 days of transplant, and commencing May 12, 2006, bone marrow transplant cases were paid at $2,500 per day for the first 35 days of transplant.  Id. Amendment 11, §§ 4.1(e)(1), 4.1(e)(2).

23.   The contract provides that for ECMO (Extracorporeal Membrane Oxygenation) services, Medi-Cal pays an all-inclusive rate of $5,000 per day not to exceed a total of 14 days.  Id. §

United States District Court
For the Northern District of California

4.1(e)(3).

24.   If HPN had reimbursed CHO for services provided to Patient A based on the rates in the Medi-Cal Contract, CHO states it would have been reimbursed according to the following rates:

> Prior to May 12, 2006, CHO's inpatient Medi-Cal general acute care per diem rate was $1927 per day.  As of May 12, 2006, CHO's inpatient Medi-Cal general acute care per diem rate was $2000 per day, and bone marrow transplant cases were paid at $2450 per day for the first 35 days of transplant.  Medi-Cal also pays an ECMO (Extracorporeal Membrane Oxygenation) rate of $5000 per day for up to 14 days instead of the general acute per diem . . . CHO is a "Disproportionate Share" hospital and is entitled, in addition to the above referenced per diem rates, to receive an additional $500 per day per Medi-Cal patient.

Ex. D-584 ("Pl.'s Supplemental Resp. to Def.'s First Set of Interrogs"), Resp. to Interrog No. 7.

III.  **CONCLUSIONS OF LAW**

    A.   Contract Interpretation

    The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.  Cal. Civ. Code § 1638; Doe 1 v. AOL LLC, 552 F.3d 1077, 1081 (9th Cir. 2009); AIU Ins. Co. v. Super. Ct., 51 Cal. 3d 807, 818 (1990).  The words of a contract are to be understood in their ordinary and popular sense.  Cal. Civ. Code § 1644.  If the contract language is not ambiguous, then the Court's inquiry should end there, because parol evidence is only admissible if a contract is ambiguous.  See e.g., Consol. World Invs., Inc. v. Lido Preferred, Ltd., 11 Cal. Rptr. 2d 524, 526-27 (Ct. App. 1992)

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

("One exception to the parol evidence rule is that extrinsic evidence may be introduced to explain the meaning of ambiguous contractual language.").

However, under California law, parties may introduce evidence to prove a latent ambiguity in the terms of a contract. "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33, 37 (1968).

Here, the phrase in dispute is "one-hundred percent (100%) of the California Medi-Cal Contracted Maximum Allowable Reimbursement rate." See LoA1; LoA2. CHO contends the phrase refers to the interim rate. HPN contends the phrase refers to the per diem rates stated in the Medi-Cal Contract. When the Court ruled on HPN's motion for partial summary judgment, the Court did not have a copy of the Medi-Cal Contract. See March 23, 2009, Order at 5 n.3. Without this evidence, the Court determined that the disputed phrase was reasonably susceptible to being interpreted as the interim rate or a per diem rate. Id. at 6.

During trial, however, portions of the Medi-Cal Contract between the State of California and CHO were submitted into evidence. See P-31. This evidence shows that the rates set in the Medi-Cal Contract are per diem rates, not the interim rate. See id. Based on this evidence, and the testimony offered at trial, the Court concludes that the disputed phrase refers to the

7

1   per diem rates stated in the Medi-Cal Contract.

2       The letters of agreement were signed by Schoener on behalf of

3   HPN. <u>See</u> LoA1; LoA2.  Schoener custom drafted the phrase "one-

4   hundred percent (100%) of the California Medi-Cal Contracted

5   Maximum Allowable Reimbursement rate."  RT at 106:17-23.

6   Schoener's intent in drafting that language was that HPN would

7   reimburse CHO according to the rate CHO would receive under its

8   Medi-Cal Contract.  <u>Id.</u> at 107:13-16.  Schoener did not intend for

9   the language to refer to the interim rate.  <u>Id.</u> at 107:17-19.

10  Schoener understood that if there was no agreement in place

11  between HPN and CHO, then HPN would be required to pay the interim

12  rate.  <u>Id.</u> at 114:18-20.  Schoener testified that if he entered

13  into a contract based on the interim rate, he would be leaving HPN

14  open to having to pay a percentage of whatever CHO wanted to bill.

15  <u>Id.</u> at 116:8-117:3.

16      The two letters of agreement were signed by Douglas T. Myers

17  ("Meyers") on behalf of CHO.  <u>See</u> LoA1; LoA2.  Myers is the Chief

18  Operating Officer and Chief Financial Officer of CHO.  RT at

19  142:12-13.  At his deposition, Myers testified that he understood

20  the word "contracted" in the disputed phrase to refer to a

21  contract with the State of California, and he also understood that

22  the contracted rate was a per diem rate.  <u>Id.</u> at 144:18-145:19.

23      Nielsen is the Director of Managed Care Contracting at CHO.

24  <u>Id.</u> at 4:16-19.  Nielsen negotiated the two letters of agreement

25  with Schoener.  <u>Id.</u> at 34:25-35:2, 43:18-20.  Nielsen understood

26  the disputed phrase in the letters of agreement to refer to the

27  interim rate.  <u>Id.</u> at 36:15-18, 44:8-13, 46:22-47:1.  However,

28

1   Nielsen did not sign the letters of agreement on behalf of CHO.

2   Myers signed them, and Myers understood the disputed phrase to

3   refer to a contracted, per diem rate.  See <u>id.</u> at 144:18-145:19.

4        The State of California calculates the interim rate.  <u>Id.</u> at

5   133:1-10.  The interim rate is a temporary rate of reimbursement

6   calculated for every hospital in California.  <u>Id.</u> at 133:17-20,

7   139:2-4.  Typically, California hospitals that have Medi-Cal

8   contracts are not reimbursed based on the interim rate.  <u>Id.</u> at

9   136:14-137:4.  However, even contract hospitals can be reimbursed

10  using the interim rate for non-contract services they provide to

11  Medi-Cal patients.  <u>Id.</u> at 139:2-21.

12       Here, the letters of agreement do not contain the words

13  "interim rate."  <u>Id.</u> at 60:10-14.  They clearly and unambiguously

14  refer to the contracted rate.  See LoA1; LoA2.  After receiving

15  the unexecuted letters of agreement from HPN, Nielsen did not

16  request that changes be made to the documents, and she did not

17  have CHO's attorneys review the language in the letters of

18  agreement.  RT at 59:19-24, 63:8-16.  Nielsen testified to a

19  discussion with Schoener about the difference between the interim

20  rate and a per diem rate, but she could not recall if the

21  discussion occurred before or after the letters of agreement were

22  executed and sent back to HPN.  <u>Id.</u> at 65:24-66:6.

23       Corrine Spaeth ("Spaeth") is HPN's Director of Claims.  <u>Id.</u>

24  at 146:25-147:1.  In her deposition, she testified that when there

25  is no letter of agreement, HPN's usual custom and practice is to

26  pay the interim rate.  <u>Id.</u> at 150:8-15.  In this case, however,

27  there are letters of agreement, and Spaeth testified that HPN's

28

**United States District Court**
For the Northern District of California

9

**United States District Court**
For the Northern District of California

usual practice is to pay a hospital according to the terms of the letter of agreement. Id. at 149:6-12. She also testified that she understood the disputed phrase to mean whatever the State of California would pay CHO for the services provided. Id. at 148:19-149:5.

Based on the language in the two letters of agreement which clearly and unambiguous refer to a contract rate, based on the evidence that rates in the Medi-Cal Contract are per diem rates, and based on the testimony and arguments presented at trial, the Court can come to only one conclusion: that the phrase "one-hundred percent (100%) of the California Medi-Cal Contracted Maximum Allowable Reimbursement rate" is a per diem rate to be calculated in accordance with the terms set out in the Medi-Cal contract between the State of California and CHO.

B.   Calculation of HPN's Overpayments

HPN paid $341,325.00 for the services and supplies provided by CHO to Patient A. Based on the rates set forth in the Medi-Cal Contract, HPN should have paid $262,697.00. This calculation is based on 35 days of treatment at the $2,500 rate for a bone marrow transplant, eleven (11) days of treatment at the $1,927 rate that applied prior to May 12, 2006, and seventy-seven (77) days of treatment at the $2,000 rate that applied commencing May 12, 2006. CHO claims to be entitled to an extra payment of $500 per day because it is a disproportionate share hospital. See Ex. D-584. However, Nielsen testified that disproportionate share payments do not apply to patients from outside California. RT at 16:15-17:5. Also, supplemental fund payments to CHO are lump sum payments.

10

See Ex. P-31.   The Court finds that CHO is not entitled to an extra payment of $500 per day for Patient A.   Therefore, HPN made an overpayment of $78,628.00.   Section 7 of the letter of agreement for Patient A entitles HPN to recovery of the overpayment.

HPN paid $44,745.09 for the services provided by CHO to Patient B.   Based on the rates set forth in the Medi-Cal Contract, HPN should have paid $12,000.   This calculation is based on six (6) days of treatment at the $2,000 rate that commenced May 12, 2006.   For the same reasons as explained in the previous paragraph, CHO is not entitled to an extra payment of $500 per day for services provided to Patient B.   Therefore, HPN made an overpayment of $32,745.09.   Section 7 of the letters of agreement for Patient B entitles HPN to recovery of the overpayment.

///
///
///
///
///
///
///
///
///
///
///
///
///

11

**IV.   CONCLUSION**

The Court concludes that HPN did not fail to pay the contractually required sum for the medical services CHO provided to Patient A, and CHO takes nothing by way of its Complaint.  With regard to HPN's Counterclaim, the Court concludes that HPN overpaid CHO for the services provided to Patient A in the amount of $78,628.00.  The Court concludes that HPN overpaid CHO for the services provided to Patient B in the amount of $32,745.09.  HPN is entitled to a refund of $111,373.09.

IT IS SO ORDERED.

Dated: April 30, 2009

_____
UNITED STATES DISTRICT JUDGE